**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Bridgepoint Construction Services Incorporated, *et al.*, | No. CV-16-00078-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| James Lassetter, | |
| Defendant. | |

At issue are Plaintiff Norm Salter's Brief (Doc. 144, Br.), Defendant James Lassetter's Response (Doc. 146, Resp.), and Plaintiff's Reply (Doc. 147, Reply), all filed in response to the Court's Order (Doc. 143) requiring Plaintiff and Plaintiff's counsel to demonstrate why they should not be sanctioned for misrepresenting material facts to the Court.[1]

## I. BACKGROUND

Although the Court laid out the salient background facts in its prior Orders (Docs. 136, 143), the Court will repeat them here for the sake of comprehensiveness. Vista Oceano La Mesa Venture LLC ("Vista Oceano") was formed to act as owner and developer of a residential real estate project in Santa Barbara, California. Its sole member was Tenacious Adventures II, LLC, an entity controlled by Defendant, and its manager was Point III Holdings, Inc., an entity controlled by Martin Newton. Bridgepoint acted as

---

[1] In a prior Order, the Court dismissed the claims of the other Plaintiff, Bridgepoint Construction Services Inc., in this matter. (Doc. 136 at 12, 13 & n.3.)

the general contractor for the project and all parties agree that Plaintiff was a shareholder and director of Bridgepoint at all relevant times.

Disputes arose from the development, construction and sales of units in the Santa Barbara project, and in July 2014, Plaintiff and Bridgepoint brought an action in California state court against Vista Oceano, Tenacious, Defendant, Point III and Newton, among other defendants. The California court dismissed Defendant, an Arizona resident, from that action for lack of personal jurisdiction. Thereafter, Plaintiff and Bridgepoint brought this action against Defendant, raising claims similar to those in the California matter. So far as this Court knows, the California matter remains pending and is set for trial in September 2018.

On August 8, 2017, Defendant filed a Motion to Quash Plaintiff's Subpoena to Wells Fargo (Doc. 75), requesting that the Court block Plaintiff's attempt to obtain Wells Fargo Bank records pertaining to accounts owned by Vista Oceano—the entity that was the owner and developer of the real estate project at the center of this lawsuit. Relatedly, on February 2, 2018, Defendant filed a Motion for Protective Order (Doc. 124), requesting that the Court prohibit Plaintiff from seeking the Wells Fargo bank records and other discovery Defendant contended was duplicative, irrelevant, overbroad and overly burdensome.

In the brief that is the subject of the Court's present inquiry (Doc. 128, "Brief in Question"), filed on February 7, 2018, Plaintiff—acting through his counsel, Robert G. Klein of the Law Office of Robert G. Klein in Beverly Hills, California—argued that the information he sought was relevant and discoverable and represented the following to the Court:

> In October 2010 Dilip Ram ([Plaintiff's] longtime real estate development partner who is not a party to this action) negotiated the purchase and a $9.45 million construction loan from Preferred Bank on [real estate owned] beach view property in Santa Barbara California. Dilip Ram and [Plaintiff] needed to raise an additional $3 million from an investor to share in the profits on this real estate development opportunity. [Plaintiff] offered this

opportunity to his cousin Martin Newton who then introduced [Defendant] to [Plaintiff] and Ram as an investor.

In March 2011 Newton, [Defendant], [Plaintiff] and Ram **agreed to be partners** and share in the profits of this project. **Dilip Ram signed Articles of Organization to form Vista Oceano La Mesa Venture LLC. [Exhibit 1]**

**In March 2011 [Plaintiff] opened a bank account at Wells Fargo bank for Vista Oceano La Mesa Venture LLC. [Plaintiff] was, and still is listed as the co-owner and co-signer on Vista Oceano La Mesa Venture LLC's bank account at Wells Fargo. [Exhibit 2]**

(Brief in Question at 2 (emphasis added).)

In reply, Defendant pointed out that Plaintiff's Exhibit 1—a March 2011 document signed by Ram—was not the authentic Articles of Organization for Vista Oceano; rather, the authentic Vista Oceano Articles of Organization were signed by Newton, not Ram, and filed with the State of California in October 2010. (Doc. 131 at 2-3.) Defendant also noted that Plaintiff's Exhibit 2—a Wells Fargo account application for Vista Oceano—was not stamped as received by Wells Fargo and was redacted to hide the signatures of Plaintiff and Newton, so its authenticity was unclear. (Doc. 131 at 3-4.)

About a month later—on March 16, 2018—in response to a separate motion, Plaintiff recited the same facts but, with regard to Exhibit 1, added a footnote stating that "Ram forgot that in October 2010 when he first thought they had a deal, Dilip Ram had his attorney Rubin Turner prepare Articles of Organization for Martin Newton's signature." (Doc. 134 at 3 n.1.)

On March 30, 2018, the Court granted Defendant's Motion to Quash Plaintiff's Subpoena to Wells Fargo and denied as moot Defendant's Motion for Protective Order. (Doc. 136 at 16-22.) In so doing, the Court noted that Plaintiff improperly reviewed documents delivered in error by Wells Fargo to Plaintiff while another motion to quash was still pending, which motion the California state court ultimately granted. (Doc. 136 at 18; Doc. 75 at 3 & Ex. 6 at 3-5; Doc. 77 at 2-3.) To make matters worse, Plaintiff used

information from the errantly delivered documents to subpoena records in this matter. For this and other reasons, the Court quashed that portion of Plaintiff's subpoena.

Moreover, concerned that Plaintiff made misrepresentations and submitted inauthentic documents to this Court in support of his arguments, the Court stayed all proceedings in this matter and ordered Defendant to subpoena the State of California and Wells Fargo to procure the authentic versions of the documents Plaintiff had submitted to the Court as Exhibits 1 and 2. (Doc. 136 at 23-24.) Defendant satisfied the Court's requests by submitting the authentic documents provided by the State of California and Wells Fargo.[2] (Docs. 137, 139, 142.)

### 1.    Articles of Organization for Vista Oceano

In the Brief in Question, Plaintiff submitted Exhibit 1—March 2011 Articles of Organization for Vista Oceano—to the Court as evidence material to the question of whether and to what extent Plaintiff, Ram, Defendant and Newton cooperated to form Vista Oceano. In the Second Amended Complaint,[3] Plaintiff alleges that, while Defendant and Newton were the only members and/or managers of Vista Oceano at any given time, as indicated by the entity's Operating Agreements (*e.g.*, Doc. 65-7 at 16-36), all four individuals "formed" Vista Oceano, Plaintiff and Ram had "full access to the books and records of Vista Oceano," and all four individuals "held themselves out as partners in the Santa Barbara project." (Doc. 60, SAC ¶¶ 19-21.)

To try to demonstrate collaboration between the four in forming Vista Oceano, Plaintiff explicitly represented to the Court that Ram, Plaintiff's "longtime real estate development partner," "signed Articles of Organization to form Vista Oceano," attaching Exhibit 1 in support. (Doc. 128 at 2; Ex. 1.) This was a patent misrepresentation, as demonstrated by the document produced by the State of California showing that Newton

---

[2] Defendant sent the original, undistorted documents from the State of California and Wells Fargo to the Court, and Defendant provided copies to Plaintiff. The documents provided do not yet appear on the docket, but, to complete the public record, the Court will order Defendant to file the documents on the docket.

[3] The Second Amended Complaint (Doc. 60) is the operative pleading, with the exceptions noted in the Court's March 30, 2018 Order (Doc. 136).

alone signed Articles of Organization to form Vista Oceano. (*See* Doc. 139.) Indeed, all of the documents with any legal effect before the Court show that Newton was the organizer of Vista Oceano and that only Defendant and Newton were members and/or managers of Vista Oceano (through their entities).

After Defendant raised this issue in his Reply (Doc. 131), Plaintiff sought to explain in a footnote to a subsequent brief that Ram "forgot" that Newton had already formed Vista Oceano in October 2010 (Doc. 134), meaning the document Ram purportedly signed in March 2011 had no legal effect.[4] The Court noted in its prior Order (Doc. 143) that, whether or not Ram "forgot" in 2011 that Newton had already formed Vista Oceano in 2010 was of no moment to the question before the Court. Plaintiff knew—or certainly should have known—when he filed a brief with this Court in 2018 that the Articles of Organization document he attached was not authentic, yet he not only submitted it to the Court but represented that it meant something that he must have known was untrue, namely, his assertion that Ram was the organizer of Vista Oceano. This was material to the question Plaintiff put before the Court: whether Plaintiff and Ram were part of a partnership with Newton and Defendant to form Vista Oceano such that Plaintiff should be allowed access to the Vista Oceano account information at Wells Fargo.

### 2. Wells Fargo Bank Account Information for Vista Oceano

In the Brief in Question, Plaintiff also provided Exhibit 2 (Doc. 128-2) to the Court, a Wells Fargo Business Account Application for Vista Oceano, arguing it was further evidence of collaboration between the four individuals to form Vista Oceano. Indeed, in his opposition to Defendant's Motion for Protective Order, Plaintiff argued

---

[4] In a "Response to Status Report," Plaintiff attached a number of documents that purport to show that Ram tried to submit Articles of Organization for Vista Oceano to the State of California in March 2011. (Doc. 140.) The documents are not attached to a Declaration or Affidavit, and Plaintiff thus provided no authentication or foundation for these documents. (Doc. 140-1.) Moreover, it is irrelevant to the issue before the Court, because Plaintiff must have known this purported Articles of Organization document had no legal effect when he submitted it to the Court, but nonetheless represented the opposite when filing it.

that Defendant improperly "filed a motion to quash [Plaintiff's] subpoena served on Wells Fargo bank even though [Plaintiff] is listed as a co-owner and co-signatory on that account." (Brief in Question at 7.) In his brief, Plaintiff stated that Exhibit 2 is a "March 2011" Wells Fargo Business Account Application listing Plaintiff as "co-owner" of Vista Oceano and that he "was, and still is listed as the co-owner and co-signer" on Vista Oceano's account at Wells Fargo. (Brief in Question at 4.)

In reply, Defendant challenged the authenticity of the Business Account Application that Plaintiff filed with the Court because (1) it is not stamped or otherwise marked as received by Wells Fargo, and (2) the signature lines are redacted, and there is no evidence that the Business Account Application was approved or agreed to by Newton—a proposition Defendant found "particularly troubling given [Plaintiff's] prior admissions that he has directed others to forge Martin Newton's signature on multiple occasions." (Doc. 131 at 3-4.)

In its prior Order (Doc. 143), the Court first noted that the document Plaintiff himself provided as Exhibit 2 (Doc. 128-2) shows that the Application was dated June 15, 2013, not March 2011 as Plaintiff represented in the Brief in Question. A review of the documents Wells Fargo provided reveals that the bank did receive the Business Account Application for Account -3742, dated June 15, 2013, and gave it a bar code and identification number. (*See* Doc. 142.) The signature lines on the Application are not redacted, but Newton did not sign the Application.[5]

The Court could not discern why Plaintiff apparently redacted the signature lines in the Application he submitted to the Court as Exhibit 2 when he did not redact, for example, his social security number and address or those of Newton. The troubling aspect of this redaction is that Plaintiff apparently redacted both his and Newton's signature lines, when it appears from the document Wells Fargo produced that Newton never signed the Application. Newton's signature would have indicated his assent to Plaintiff's

---

[5] While Newton's signature is marked "submit manually," all of the other documents Wells Fargo provided in which a signature is marked "submit manually" do contain the signature, unlike this Application.

- 6 -

self-characterization as "co-owner" and to Plaintiff's access to the account. Without the signature, there is no such indication of assent by Newton.

With the information before it, the Court was left to conclude that, by redacting Newton's signature line when Newton never signed the Application—in other words, by redacting a blank space—Plaintiff represented to the Court that Newton signed the Application when he did not. The redaction itself was a misrepresentation. This is again material to the questions before the Court of whether there was cooperation between the four individuals—here, Newton and Plaintiff specifically—in the operation of Vista Oceano and whether Plaintiff had proper authorization to access the Wells Fargo account.

Other documents Wells Fargo provided in response to Defendant's subpoena show that Newton deleted Plaintiff's authorization to sign for Vista Oceano Account -3742 on June 16, 2014, a year after it was set up. (*See* Doc. 142.) Thus, not only did Plaintiff misrepresent in his brief the date the account was set up—it was 2013, not 2011—but he also misrepresented that he is "still listed as the co-owner and co-signer" for the Vista Oceano account, when he must have known he is not.

For the most part, the Court ruled in Defendant's favor with regard to Defendant's Motion to Quash (Doc. 75) and Motion for Protective Order (Doc. 124), so the immediate prejudice arising from Plaintiff's misrepresentations was reduced. The Court noted, however, that the Court must be able to rely on the accuracy of the parties' representations and the authenticity of the parties' evidence, particularly at a time such as this when the Court is working under a heavy case load. (Doc. 143.) A party that engages in misrepresentations such as those identified above loses the trust of the Court, and indeed Plaintiff's misrepresentations threaten the integrity of this judicial proceeding. The Court stated it may in its discretion enter sanctions against Plaintiff and/or Plaintiff's counsel, up to and including dismissal of this matter, under Federal Rule of Civil Procedure 11 and/or the Court's inherent authority. *See, e.g.*, *Fink v. Gomez*, 239 F.3d 989 (9th Cir. 2001); *Coulter v. Baca*, 2014 WL 12589652 (C.D. Cal. May 23, 2014); *Coston-Moore v. Medina*, 2012 WL 1551735 (E.D. Cal. May 1, 2012). Accordingly, the

Court gave Plaintiff an opportunity to show cause why he and/or Plaintiff's counsel should not be sanctioned under Rule 11 and/or the Court's inherent authority for the misrepresentations identified in the Court's Order, and the Court left the stay on this case in place. (Doc. 143.) The parties have filed their responsive briefs, and the Court will now address whether and to what extent Plaintiff's actions warrant sanctions.

## II. LEGAL STANDARD

### A. Rule and Statute

In relevant part, Rule 11(b) provides that, in any filing to the Court, an attorney "certifies to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,]" that " . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." The Court may, on its own initiative, "impose an appropriate sanction" on an attorney, law firm, and party that violates Rule 11(b) after the Court gives them a reasonable opportunity to respond. Fed. R. Civ. P. 11(c)(1), (3).

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4).

Under 28 U.S.C. § 1927, the Court may require any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

### B. The Court's Inherent Power

By their very nature, courts have certain implied powers, including to "impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227 (U.S. 1821)). "These powers are 'governed not by rule or

statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id.* (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).

For example, a federal court's inherent power allows it to "set aside fraudulently begotten judgments," which "is necessary to the integrity of the courts, for tampering with the administration of justice in [this] manner . . . involves far more than an inquiry to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." *Id.* at 44 (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944)). Thus, "a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Id.* (citing *Universal Oil Prods. Co. v. Root Refining Co.*, 328 U.S. 575, 580 (1946)).

Congress has not displaced or limited a federal court's inherent power to address a fraud on the court by rule, including Rule 11, or statute, including 28 U.S.C. § 1927. *Id.* at 42-43, 47-48. "[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50.

A court must "fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45. It is within a court's inherent power to dismiss a lawsuit— "a particularly severe sanction"—or assess attorney's fees—a "less severe sanction." *Id.* at 45 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citing *Roadway Express*, 447 U.S. at 764)).

## III.    ANALYSIS

In its prior Order (Doc. 143), the Court already found that, in the Brief in Question, Plaintiff misrepresented to the Court who created Vista Oceano, and when, by providing to the Court an inauthentic Articles of Organization document, and that a

number of alarming inconsistencies were present in the information Plaintiff provided with respect to Vista Oceano's Wells Fargo bank account. The Court also already found that these representations were material to both the narrower question before the Court— whether Plaintiff was entitled to receive the Wells Fargo bank records pertaining to Vista Oceano's account—and the broader question before the Court—whether Plaintiff and Ram were part of a partnership with Newton and Defendant to form Vista Oceano, the owner and developer of the real estate project at the center of this lawsuit. The Court gave Plaintiff the opportunity to explain the identified representations (Doc. 143), and the Court will now evaluate those explanations.

### A.    Vista Oceano Articles of Organization

In his Brief in response to the Court's Order, Plaintiff explains that he and Ram "had a very successful partnership developing real estate since the 1990's," and when "the real estate market crashed" in 2008, they filed for Chapter 11 bankruptcy protection. (Br. at 2.) As a result, Plaintiff could not secure new debt for real estate development and "approached Martin Newton about forming a corporation to construct and develop real estate," at which point they formed Bridgepoint. (Br. at 3.) In 2010, Newton, through his entity Point III Holdings, signed a purchase contract for the Santa Barbara project and advanced a $200,000 deposit. (Br. at 4.) Plaintiff reports that Ram approached his attorney, Rubin Turner, in October 2010 to prepare Articles of Organization for Vista Oceano—the planned Santa Barbara project owner and developer—for Newton to sign and with Newton listed as the organizer. (Br. at 4.) However, the first attempt at developing the Santa Barbara project failed when the required financing could not be obtained.

The Santa Barbara project came back to life when the bank lowered the price for the land and agreed to provide a loan. (Br. at 4-5.) Ultimately, Defendant and Newton agreed to finance the project. (Br. at 5.) Plaintiff states that Turner sent an e-mail to Ram on March 3, 2011, reporting that he had not filed the original Articles of Organization for Vista Oceano before the deal fell through the first time. (Br. at 5.) Plaintiff further states

that Turner prepared a second Articles of Organization in March 2011 and "had Dilip Ram sign the document, and then Rubin Turner sent it to the Secretary of State." (Br. At 5.)

Regarding his provision of the second, inauthentic Articles of Organization to the Court in the Brief in Question, Plaintiff states it was "not intended to deceive" and he "reasonably believed that the March 2011 document was the formation document at the time it was submitted to the Court." (Br. at 7.) In viewing the evidence, the Court finds no basis for that belief.

Plaintiff's first explanation to the Court, on March 16, 2018, was that Ram "forgot" he had asked Turner to form Vista Oceano in October 2010 when he asked Turner to prepare the Articles of Organization in March 2011. (Doc. 134 at 3 n.1.) However, Plaintiff's own evidence now shows that Ram knew—or was reminded—that he had asked Turner to form Vista Oceano in October 2010 by way of Turner's March 3, 2011 e-mail, which said that the "LLC was not filed when the deal cratered earlier" and he was working "on revised documents and will furnish to [Ram] when ready." (Doc. 144-9.)

Importantly, on March 10, 2011, before Ram signed the Articles of Organization, Turner informed Ram that the Articles of Organization had indeed "already been filed." (Doc. 140-1 at 1.) This communication makes it entirely unclear how Ram's signature ended up on the March 2011 version of the Articles of Organization. Finally, in his Reply, Plaintiff explains that Ram signed this version on March 16, 2011—even though he knew the Articles had already been filed—to provide to the bank, presumably in conjunction with obtaining financing. (Reply at 2.) Thus, when Plaintiff explained in his Brief that Turner prepared a second Articles of Organization in March 2011, "had Dilip Ram sign the document," and "sent it to the Secretary of State" (Br. at 5), he must have meant to send to the bank[6] (Reply at 2) and not for the purpose of forming Vista Oceano—as Plaintiff has repeatedly represented and sworn to the Court.

_____

[6] Presumably, Ram made the same misrepresentation to the bank as he has made here—that the March 2011 Articles of Organization was the authentic document for Vista Oceano's formation.

- 11 -

The Court cannot abide Plaintiff's David-Copperfield-style litigation tactics. Even if the Court accepts the latest of Plaintiff's ever-changing explanations, Plaintiff's position that he reasonably believed the March 2011 Articles of Organization were authentic <u>when he provided the document to the Court</u> is ultimately belied by the fact that Turner informed Ram—on March 10, 2011—that his check to the California Secretary of State was not necessary because the Articles of Organization had "<u>already been filed</u>." (Doc. 140-1 at 1.) Thus, in 2018, Ram neither reasonably "forgot" Vista Oceano was already formed by Newton in October 2010, nor reasonably believed Turner never filed the Articles of Organization in October 2010. Yet, on February 6, 2018, Ram executed an affidavit under penalty of perjury in support of Plaintiff's submission of Exhibit 1, the inauthentic March 2011 Articles of Organization, stating:

> In furtherance of our partnership agreement, I filed the Articles of Organization for Vista Oceano La Mesa Venture, LLC. A copy of the Articles of Organization is attached as Exhibit [1]. That is my signature on Exhibit 1.

(Brief in Question, Doc. 128-6, Ram Decl. ¶ 11.) The Court can only conclude that this was a knowing and intentional misrepresentation to the Court. And it is Plaintiff's counsel and Plaintiff who are responsible for providing this Declaration to the Court, along with what, from a straightforward review of the evidence, they must have known was an inauthentic March 2011 Articles of Organization document, in support of their argument that Ram, not Newton, was the organizer of Vista Oceano and that Plaintiff and Ram were in partnership with Newton and Defendant.

The Court also takes issue with counsel for Plaintiff's representation that he "immediately corrected" the mistake once he discovered it. (Reply at 2.) To begin with, Plaintiff did not even provide an accurate correction in his most recent Brief addressing why he should not be sanctioned (Br. at 5), and only attempted a complete explanation in his Reply (Reply at 2), after Defendant pointed out yet more discrepancies in Plaintiff's Brief.

In any event, the Brief in Question—in which Plaintiff originally made the misrepresentations at issue—is dated February 7, 2018. (Brief in Question at 1.) On

February 14, 2018, Defendant filed a Reply identifying the discrepancies in Plaintiff's evidence. (Doc. 131.) On March 16, 2018, in response to a separate motion, Plaintiff did not change his story but, with regard to the inauthentic March 2011 Articles of Organization, added a footnote with the entirely inaccurate and incomplete explanation that "Ram forgot that in October 2010 when he first thought they had a deal, Dilip Ram had his attorney Rubin Turner prepare Articles of Organization for Martin Newton's signature." (Doc. 134 at 3 n.1.) On March 30, 2018, the Court entered its Order granting Defendant's Motion to Quash Plaintiff's subpoena and expressing its concern over Plaintiff's representations. (Doc. 136.) It was only on April 23, 2018, in a document that purported to respond to Defendant's status reports regarding the Court-ordered subpoenas to the State of California and Wells Fargo, that Plaintiff began to explain his misrepresentation, if (again) entirely inadequately. (Doc. 140.) Plaintiff's correction to his misrepresentation with regard to the March 2011 Articles of Organization was neither immediate nor accurate; indeed, Plaintiff only "corrected" his representations as and when each discrepancy in his story was uncovered.

### B. Wells Fargo Bank Account Information for Vista Oceano

While Plaintiff's knowing misrepresentations regarding the Articles of Organization are, by themselves, evidence of bad faith and sufficient to warrant sanctions, the Court will also discuss Plaintiff's representations with regard to the Wells Fargo -3742 bank account of Vista Oceano. The Court first noted in its previous Order that Plaintiff provided to the Court the Wells Fargo Business Account Application with both signature lines redacted (Brief in Question Ex. 2), implying that both his and Newton's signatures were present but redacted. (Doc. 143 at 5.) That version of the Application did not have other personal information redacted, such as the taxpayer identification numbers, nor did it contain any Wells Fargo stamp or other sign of receipt by the bank. On the other hand, the version of the Application provided by Wells Fargo pursuant to Defendant's request shows that only Plaintiff, not Newton, signed the Application, and it contained a barcode identification from the bank.

In his latest Brief, Plaintiff explains that the version he submitted to the Court—with only the signature lines redacted—is the version Wells Fargo handed him when he opened the account in June 2013. (Br. at 8.) The Court still finds it problematic that Plaintiff represented to the Court that Newton signed the Application when he did not and must not have when the bank allegedly handed Plaintiff the redacted copy of the Application that Plaintiff provided to the Court. It is also not apparent to the Court why the bank's procedure would be to hand a person opening a new account a copy of the application with no indication it has been received and processed by the bank and with the signature lines but not personal identification information redacted. Though the Court is tempted to investigate this matter further, the Court will decline to do so because the Court has already found Plaintiff made material misrepresentations in other areas.

The Court also noted previously that Plaintiff represented that he opened the -3742 Account in March 2011 (Brief in Question at 2 & Ex. 2), but the Application shows it was opened on June 15, 2013. (Doc. 143 at 5.) Plaintiff now explains that the 2011 account was "hacked" and he had to open new accounts in 2013. (Br. at 7.) Although Plaintiff's representation in the Brief in Question was inaccurate in its incompleteness, the Court does not find evidence that Plaintiff tried to materially mislead the Court with regard to the date of the -3742 Account formation.

Finally, the Court noted previously that, while Plaintiff represented that he is "still listed as the co-owner and co-signer" of the Vista Oceano -3742 Account (Brief in Question at 2), the Wells Fargo documents reveal that Newton deleted Plaintiff's authorization to sign for the Account on June 16, 2014. (Doc. 143 at 6.) While Plaintiff has admitted that Newton changed the passcode for online access to the account, Plaintiff now represents that the first time he learned that Newton deleted his signature authorization for the account in 2014 "was when [he] saw the Wells Fargo documents recently produced." (Br. at 8.) This strains credulity. Plaintiff has expended a great deal of time and work with regard to obtaining Vista Oceano's bank account information, both in this action and especially in the California action—a process that certainly would have

been more straightforward if Plaintiff still had access to the account, as he now represents he believed he did throughout the process. The Court cannot find it plausible that Plaintiff was unaware he did not have access to the Vista Oceano bank account until the Wells Fargo documents were recently produced, long after the extensive motion practice related to obtaining the account information was over. Here, the Court must find that Plaintiff knew, or reasonably should have known, that he had no access to the Vista Oceano -3742 account information, but he represented the opposite to the Court in the Brief in Question as evidence of a partnership—or "co-ownership," as Plaintiff characterized it—with Newton in Vista Oceano.

## C. Course of Conduct

This action is a spin-off of the California action, and the Court cannot ignore that the very subpoena on Wells Fargo that gave rise to the representations now at issue was in part the product of an improper use by Plaintiff of errantly disclosed information in the California action. As the Court already found in its prior Order (Doc. 136 at 18), in the California action, Plaintiff received Wells Fargo documents in error while a motion to quash the Wells Fargo subpoena was still pending. When apprised of the event, the California court ordered that Plaintiff's counsel destroy the documents and make no use of the material errantly delivered. (Doc. 75 at 3.) But he did, as he has conceded. (Doc. 75 Ex. 6 at 3-5; Doc. 77 at 2.) Then Plaintiff subpoenaed records in this action—from both Wells Fargo and U.S. Bank—based on information Plaintiff learned through Wells Fargo's errant production and Plaintiff's improper review of it in the California action. Thus, not only did Plaintiff knowingly misrepresent facts to the Court to try to enforce the subpoena on Wells Fargo in this action, but the subpoena was founded on improper use of information from the California action. The Court considers this to be more evidence of bad faith on the part of Plaintiff and Plaintiff's counsel.

Indeed, this case has been filled with shenanigans on the part of Plaintiff and Plaintiff's counsel from the start. As but one further example, in the Complaint and First Amended Complaint ("FAC"), Plaintiff alleged that Newton was at all times a 75%

shareholder and director of then-Plaintiff Bridgepoint, and Plaintiff was the other director and shareholder. (Doc. 1 ¶¶ 10-11; Doc. 20 ¶¶ 10-11.) Defendant admitted those allegations in his Answer. Based on similar allegations in the California action, the defendants there raised the issue of corporate control and sought dismissal of Bridgepoint's claims, reasoning that as a minority shareholder and only one of two directors, Plaintiff lacked authority to cause Bridgepoint to take legal action without the vote of the other director and majority shareholder—Newton. The California court agreed with the defendants and on this basis summarily disposed of Bridgepoint as a plaintiff.

After the California defendants filed their motion to dismiss and while it was pending there, Plaintiff moved in this case to amend the FAC to change his allegations relating to ownership and directorship of Bridgepoint (Doc. 45). Over Defendant's opposition (Doc. 50), the Court granted Plaintiffs' Motion (Doc. 59). In the Second Amended Complaint ("SAC"), Plaintiff alleged that "[e]ffective December 31, 2013, Martin Newton resigned as director of Bridgepoint and transferred his entire stock ownership in Bridgepoint to [Plaintiff]." (Doc. 60, SAC ¶¶ 8, 9.) The SAC alleged that thereafter Plaintiff "became the sole director and sole shareholder in Bridgepoint." (SAC ¶ 8.)

In its opposition and then in a Motion for Reconsideration, Defendant pointed out to the Court that Plaintiff's new allegation was not only inconsistent with Plaintiff's allegations in the California action but also with his statements to the Bankruptcy Court in 2015. After Newton filed a bankruptcy petition on behalf of Bridgepoint in 2015—two years after the date Plaintiff alleged in this action that he became the sole director and shareholder of Bridgepoint—Plaintiff executed a Declaration stating that he was only "a 25% shareholder and one of two directors in Bridgepoint Construction Services, Inc." (Doc. 98 Ex. 3 at 16.) Seeking to dismiss the bankruptcy petition, Plaintiff then argued to the Bankruptcy Court that Newton had brought the petition in bad faith because, although he remained the majority shareholder of Bridgepoint, he brought the bankruptcy petition to aid his interests in Vista Oceano.

Plaintiff succeeded in persuading the Bankruptcy Court in 2015 to accept his position that Newton was a director and majority shareholder in Bridgepoint—the allegation he tried to abandon in the SAC in this action. Indeed, that finding was a basis of the Bankruptcy Court's ruling in favor of Plaintiff and Bridgepoint. In a prior Order (Doc. 136 at 3-8), this Court concluded that Plaintiff Salter and then-Plaintiff Bridgepoint were judicially estopped from alleging in this action that Salter was the sole director and shareholder of Bridgepoint, noting:

> To allow Plaintiffs now to allege and maintain the contrary position—that Newton holds no such directorship and ownership interest in Bridgepoint—simply because Plaintiffs' interests have changed in now having to react to a challenge to Salter's authority to bring this action in Bridgepoint's name, is precisely the result the doctrine of judicial estoppel exists to prevent. It would "create the perception that the [Bankruptcy Court or this Court] was misled." Such a result would also create a situation where a party can take and abandon factual positions in litigation solely based on facility to their desired ends. This would completely undermine the ability of other parties to have notice of the factual bases for Plaintiffs' claims and theories, and to plan and prepare their defense to such claims. For this very reason, the final factor for judicial estoppel is met—Plaintiffs seeking to assert an inconsistent position would "derive an unfair advantage" and "impose an unfair detriment to" Defendant.

(Doc. 136 at 7-8 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-51 (2001)).)

Although the Court ultimately addressed Plaintiff's inconsistent representations regarding the ownership of Bridgepoint by disallowing Plaintiff's amendment to the SAC, the Court must now consider the fact that, in yet another instance, Plaintiff must have intentionally misled either this Court or the Bankruptcy Court to suit his needs and to the detriment of Defendant.

## D. Sanctions

### 1. Dismissal

If misrepresentations to a district court are merely the product of recklessness, then sanctions under Rule 11 or § 1927 are sufficient. *Fink v. Gomez*, 239 F.3d 989, 992-93 (9th Cir. 2001); *see also Yagman v. Republic Ins.*, 987 F.2d 622, 628 (9th Cir. 1993) (sanctions not available under court's inherent power where there is no evidence the attorney "acted in bad faith or intended to mislead the court"); *Zambrano v. City of*

*Tustin*, 885 F.2d 1473, 1485 (sanctions not available under court's inherent power when conduct is merely inadvertent). However, in *Chambers* and *Roadway Express*, discussed earlier, "the Supreme Court made clear that courts have the inherent power to impose sanctions for 'willful abuse of judicial processes.'" *Id.* at 992 (quoting *Roadway Express*, 447 U.S. at 766). Such willful abuse includes "frivolousness, harassment, or an improper purpose." *Id.* at 994. Knowingly false representations to the court by a party and his lawyer on an issue that relates to the matters in controversy also constitutes willful abuse. *Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995); *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983).

In his latest brief (Resp. at 9-11), Defendant seeks terminating sanctions against Plaintiff. Under the Court's inherent power, "dismissal is warranted where . . . a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings." *Anheuser-Busch*, 69 F.3d at 348-49 (collecting cases). If a court finds that a party and/or counsel have engaged in the requisite deceptive practices, the court must exercise its power to dismiss the case with caution, and the court's entry of a terminating sanction must be consistent with the principles of due process. *Wyle*, 709 F.2d at 591. Specifically, the court must first find that there is "relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression 'threatens to interfere with the rightful decision of the case.'" *Anheuser-Busch*, 69 F.3d at 348 (quoting *Wyle*, 709 F.2d at 591). The court should also examine the risk of prejudice to the party seeking sanctions and the availability and efficacy of a lesser sanction. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 948 (9th Cir. 1993).

The facts reveal that, on repeated occasions, Plaintiff and Plaintiff's counsel knowingly misrepresented material facts for the purpose of misleading the Court, most notably by submitting inauthentic Articles of Organization for Vista Oceano and a sworn statement that Ram signed that document to form Vista Oceano in March 2011. Plaintiff continued to misrepresent the effect of the inauthentic Articles of Organization even after Defendant and the Court identified the discrepancies in Plaintiff's story. The Court has

also found that Plaintiff must have known he no longer had signature authority on the bank account for which he so arduously sought records in the California and instant actions, yet represented to the Court that he did. And the Court has found that the very basis of the subpoena that gave rise to the misrepresentations now at issue was in part the product of an improper use by Plaintiff of errantly disclosed information in the California action, in violation of a court order there. In addition, Plaintiff has intentionally made material misrepresentations earlier in the course of this action, including to either this Court or the Bankruptcy Court with regard to Plaintiff's ownership and directorship interests in Bridgepoint. Considering Plaintiff's course of conduct in this action, the Court finds Plaintiff and Plaintiff's counsel have willfully deceived the Court and engaged in conduct entirely inconsistent with the orderly administration of justice, and the Court thus has the inherent power to sanction Plaintiff and Plaintiff's counsel. *See Wyle*, 709 F.2d at 589.

As the Court has addressed above, Plaintiff's misrepresentations and improper use of errantly disclosed information were directly related to the matters in controversy such that they could have interfered with the rightful decision of this case. *See Anheuser-Busch*, 69 F.3d at 348. Defendant thus unquestionably suffered prejudice as a result of the Plaintiff's misconduct. *See Henry*, 983 F.2d at 948 (noting if the plaintiff's misconduct results in interference with the rightful decision of the case, the defendant suffers prejudice).

The Court does not take a decision to dismiss this action lightly, but it must find that no lesser sanction would suffice. The instances of misconduct the Court has identified here were not merely inadvertent or reckless. Plaintiff and Plaintiff's counsel deliberately and repeatedly tried to mislead the Court and deliberately misused errantly produced information from another case to their advantage in this case, and this is nothing short of bad faith. Not only have Plaintiff and Plaintiff's counsel lost all credibility with this Court, but their actions have undermined the integrity of this judicial proceeding. And the Court can only anticipate that, if this action were to proceed,

Plaintiff's and counsel for Plaintiff's deceptive misconduct would continue. The Court will thus dismiss this action in its entirety. *See Chambers*, 501 U.S. at 43-52; *Annheuser-Busch*, 69 F.3d at 348-55; *Wyle*, 709 F.2d at 591.

### 2. Attorneys' Fees

The Court may also award attorneys' fees when a party has acted in bad faith. *Chambers*, 501 U.S. at 45-46 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)). Here, the Court finds that an assessment of attorneys' fees is appropriate for Plaintiff's bad faith conduct, though not in the entire amount of attorneys' fees Defendant has incurred in this action. Rather, because the deliberate and deceptive misconduct principally at issue here is Plaintiff's misrepresentations and misuse of information in conjunction with Plaintiff's subpoenas for bank account information, the Court will award Defendant his fees incurred in quashing the subpoenas and the Court's subsequent investigation into Plaintiff's representations. Counsel for Defendant avers that the fees incurred in investigating and preparing the relevant documents, which she lists, were $46,661. (Doc. 146-1, Brach Decl. ¶ 18.) Under its inherent authority, the Court will thus award Defendant $46,661 for Plaintiff's deliberate and deceptive misconduct in this action.

### 3. Attorney Misconduct

Because the Court's findings in this Order implicate misconduct on the part of Plaintiff's counsel—Robert G. Klein of the Law Office of Robert G. Klein in Beverly Hills, California—the Court will forward a copy of this Order to the State Bar of California.

**IT IS THEREFORE ORDERED** that, by October 1, 2018, Defendant shall file on the docket the documents he received from the State of California and Wells Fargo Bank pursuant to the Court's Order (Doc. 136 at 23-24), which Defendant referred to in Docs. 137, 139 and 142. Defendant shall only redact any reference to a social security number or taxpayer identification number on those documents before filing them.

**IT IS FURTHER ORDERED** dismissing this case in its entirety.

**IT IS FURTHER ORDERED** that Plaintiff Norm Salter shall pay Defendant James Lassetter an attorneys' fees award in the amount of $46,661.

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter final judgment accordingly and close this case.

**IT IS FURTHER ORDERED** directing the Clerk of Court to mail a copy of this Order to the State Bar of California at 180 Howard Street, San Francisco, CA 94105.

Dated this 21st day of September, 2018.

Honorable John J. Tuchi
United States District Judge